**INTER–OCEAN INSURANCE COMPANY, Cincinnati, Ohio, Appellant,**

v.

**Erlene ENGLER, Executrix of Ray Engler, Deceased, Appellee.**

Court of Appeals of Kentucky.

Feb. 26, 1982.

J. Granville Clark, J. Gran Clark, Jr., Russellville, for appellant.

Jesse L. Riley, Jr., Russellville, for appellee.

Before GUDGEL, McDONALD and WILHOIT, JJ.

GUDGEL, Judge:

In this appeal we are asked to interpret the phrase "first manifesting itself" used in an exclusion clause in a health insurance policy. Such clauses usually deny coverage for treatment if a disease "first manifests itself" less than a specified period of days after the policy's issuance. In this case, the trial court found that no genuine issue of material fact existed as to whether the insured's cancer first manifested itself more than ninety days after the policy's issuance and granted a summary judgment in favor of the executrix of his estate. Appellant contends that the trial court erroneously defined the phrase "first manifesting itself", and erred in granting a summary judgment. We agree with both contentions. Accordingly, we reverse and remand with directions to conduct a trial on the merits.

Ray Engler purchased a cancer insurance policy effective July 6, 1979. Part two of the policy excluded coverage unless (1) he became afflicted with cancer "first manifesting itself" more than 90 days after the policy's date, (2) while the policy was in force, and (3) for which treatment for the

disease was first received after the disease was definitely diagnosed by microscopic examination. Upon Engler satisfying these three conditions, the company agreed to pay the amount of expenses actually incurred for items of treatment described in part one of the policy. The policy did not include a definition of any of the words or phrases used in the exclusion clause.

In June 1979, Mr. Engler was being treated by his family physician for pneumonia. He had been treated for this illness on previous occasions. X-rays of his chest were made as his doctor followed the course of his recuperation. On September 27, 1979, the doctor noted a lesion on Engler's left lung. Being suspicious, the doctor referred Mr. Engler to a thoracic surgeon. The surgeon examined him on October 8, 1979, and hospitalized him on October 14. Surgery was performed on October 26 to excise the lesion. Microscopic examination of this tissue established that he was suffering from lung cancer.

Appellant denied Engler's claim for benefits on the ground that his lung cancer first manifested itself within 90 days of the policy's effective date. Specifically, appellant took the position that because the September 27 x-ray showed a lesion present in Engler's left lung which was subsequently found to be cancer following surgery one month later, the first manifestation of his cancer occurred within 90 days of the policy's effective date, and hence, coverage was excluded.

Mr. Engler filed this action on April 11, 1980, seeking to recover benefits under his cancer policy. After depositions of three treating physicians and that of a consulting physician employed by appellant were taken, both sides made motions for summary judgment. Appellant's motion was denied. Appellee's was granted.

The court found that there was no issue of fact as the lesion was not diagnosed by microscopic examination to be cancer until the operation was performed on October 26; that the American Heritage dictionary defined "manifest" as something which is clearly apparent to sight or obvious; that it was not clear or obvious Engler had cancer until the operation on October 26, which was more than 90 days after the policy's effective date; and therefore, that coverage was not excluded. This appeal followed.

Although several courts have interpreted the phrase "first manifests itself" our court of last resort has never had the opportunity to do so. However, our court has had the opportunity to deal with a similar exclusion clause in a tuberculosis policy. In *Mutual Ben. Health & Accident Ass'n v. Ramage*, 293 Ky. 586, 169 S.W.2d 624 (1943) coverage was excluded if the disease "originated" less than six months after the policy's effective date. The factual issue tried to the jury was whether Ramage's TB originated within six months. There was conflicting testimony of three physicians. Two testified that in their opinion Ramage's TB originated after the six month period had expired while the other doctor testified that it had originated within four months. The court held that there was sufficient probative evidence to submit the case to the jury even though the court was inclined to agree with the testimony of the single physician that the TB originated within six months. In doing so, the court pointed out that there is a distinction between "the infection and the time tuberculosis originates", and stated that a "disease originates when it becomes active or there exists a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease . . . . "

No useful purpose would be served by reviewing the relevant authority from other jurisdictions. Such a review would only unduly lengthen this opinion. Suffice to say that these authorities are numerous but far from uniform. *See generally* Annot., 53 A.L.R.2d 686 (1957); superseded Annot., 94 A.L.R.3d 990 (1979).

It is appropriate, however, to summarize in general terms the evolution and present status of this particular body of substantive law. Initially, most health insurance policies included an exclusion that the covered disease could not "originate" before the pol-

icy's effective date or within a specified period of days after that date. Our courts have upheld such exclusions to prevent persons from successfully defrauding innocent insurers by obtaining health insurance policies insuring against a disease they already had. Despite this policy, courts interpreted the exclusion clauses so as to prevent innocent insureds from being denied coverage by technicalities. Similarly, the language of the clause was strictly construed against the insurer and the insurer was given the burden of proof. While the existence of a disease prior to a policy's effective date did not necessarily preclude coverage, the failure of the insured to realize that he had a covered disease prior to a policy's effective date did not assure coverage.

Faced with a great deal of litigation the courts fashioned a standard for determining when a disease originated. That standard was substantially the same as the standard set forth with approval in *Mutual Ben. Health & Accident Ass'n v. Ramage, supra.*

■ Apparently seizing upon the language of this standard, the insurance industry abandoned using the word "originates" and began issuing policies which excluded coverage if the disease "first manifests itself" within a specified period of time after the policy's issuance. Inevitably, the new phrase "first manifests itself" became the subject of litigation and several courts have had the opportunity to interpret it. In doing so these courts did not abandon the *Ramage* standard, but did refine it, making it more clear and concise. One court in particular we believe has done so in a clear, succinct, and fair manner. In *McDaniel v. State Farm Mutual Ins. Co.*, 3 Kan.App.2d 174, 591 P.2d 1094 (1979) the court held that a disease "first manifests itself" during an exclusion period if symptoms are present during the period which would lead a physician to diagnose the insured's illness. Being persuaded by the simplicity and fairness of this standard, we fail to perceive any reason why we should not adopt it.

Therefore, we hold that in order for an insurer to defeat an insured's claim for health insurance benefits on the ground that the insured's covered disease first manifested itself within a specified exclusion period, the insurer has the burden of proving that sufficient symptoms of the disease are present within the specified period that a physician would be led to diagnose the disease.

■ We turn now to a consideration of whether the evidence in this case created any genuine issue of material fact that Mr. Engler's cancer first manifested itself within 90 days of his policy's effective date. We are constrained to conclude that it did.

Mr. Engler testified by deposition that he had suffered from pneumonia on several occasions over a period of years and that he consulted Dr. Curtis Mathis for the same condition in June 1979. He visited the doctor about five times and his chest was x-rayed during the visits. Treatment for his pneumonia was by prescription medicine. He claimed that Dr. Mathis never mentioned anything to him about possibly having cancer, and his first knowledge about this possibility occurred after he was referred to Dr. Franklin, a specialist, in October. He also stated that various tests and biopsy procedures performed by Dr. Franklin prior to surgery on October 26, were negative for cancer.

Dr. Mathis testified that he began treating Mr. Engler for pneumonia in his right lung in June 1979. By July 29, x-rays showed that both lungs were clear. On September 4, he saw him again and an x-ray showed inflammation in his right lung and he was again placed on medication. On September 27, he had congestion in his chest and an x-ray showed an infiltrate in his right lung and a small lesion in his left lung. He claimed that this was the first time he had seen anything in Engler's left lung. He advised Mr. Engler that he had persistent pneumonia in his right lung, and possibly a problem in his left lung, and directed him to see Dr. Franklin, a pulmonary specialist, in Bowling Green.

This advice was given because of the persistent inflammation in his right lung,

and the appearance of the lesion in the left lung. While he wrote a letter on February 27, 1980, in which he stated that on September 27 he noted an increase in size of a small lesion in his left lung, he claimed the letter was in error because he had not seen the lesion prior to September 27. He was suspicious of the left lung lesion because it could have been one of several diseases including cancer. Dr. Mathis answered certain other questions as follows:

Q 127 Taking into account Mr. Engler's age, the fact that he smoked a pack or a pack-and-a-half of cigarettes for about forty years, the fact of his prior inflammation of the right lobes, when you saw this lesion appear on the left lobe, you said that it was suspicious; suspect, and in your opinion, there was a good chance that it was carcinoma?

A That would have been my thinking.

Q 128 And that was what was on your mind when you referred him to Dr. Franklin?

A Right.

. . . .

Q 139 . . . . Dr. Mathis, is the word "suspect", does that have a different usage among doctors than it does to a lay person?

A Possibly so.

Q 140 How would you define it, as used between persons in the medical profession?

A It usually probably means trouble until proven otherwise.

Q 141 With a growth on a lobe of the lung, what is the most usual trouble that there is?

A Usually carcinoma.

Q 142 And this is even more usual when you are talking about an older male that smokes and has had a prior history of problems. Is that right?

A Right.

He also testified that the general symptoms of lung cancer are pneumonia, a weight loss, cough, bloody sputum, and the presence of nodes in the lung and a subsequent appearance of a tumor. However, he did not testify that he had diagnosed Mr. Engler as having cancer at anytime before he began treatment with Dr. Franklin.

Although Dr. Franklin's testimony was lengthy, the critical portion was as follows:

A Well, we were suspicious. As far as we could tell, at that time, he didn't have any symptoms from the left upper lobe lesion, but we were suspicious of the area on x-ray, strictly from a radiographic standpoint, and, you know, as far as I remember, he didn't complain of anything. I didn't write anything down there, or I didn't have anything in my notes that he was complaining of pain of the left side, which is ----

Q 121 Okay. Well, what I mean is: The lesion there that was obvious from the x-ray ----

A Right.

Q 122 That is a symptom of a malignancy. Is that correct?

A No, it's not a symptom.

Q 123 Well, what do you mean by a symptom?

A A symptom is something that manifests itself as pain or anemia or something to—that takes you to the doctor and then, once he got the x-ray, he got the x-ray because of the symptoms of pain in the right side.

Q 124 Right.

A And then they found a pituitous finding of a lesion in the left upper lobe.

Q 125 And, from that, then, it was determined that that needed to be investigated to determine whether or not it was malignant. Is that correct?

A That is right.

Q 126 And from that standpoint, I'm not talking about pain or anything like that, but there are certain tests you ran that, if you find a certain thing in the bloodstream, that would be a symptom of a disease, and this would be a symptom of a malignancy. Is that correct?

A No. The symptoms are the way they manifest themselves. Not necessarily radiographically, or anything else. It's, you know, feel bad, hurting, or something like that. But the x-ray finding is

just a finding you find in working up a symptom. But he didn't have any symptoms on the left side. His symptoms were on the right side.

In addition, Dr. Robert P. Koenig testified on behalf of appellant that based upon a review of Engler's medical records he would have diagnosed his condition as cancer before the ninety day period had elapsed.

In light of the standard we have adopted, and the evidence adduced, we cannot conclude that no genuine issue of material fact existed as to whether Mr. Engler's cancer first manifested itself within the 90 day exclusion period. The problem is that neither Dr. Mathis or Dr. Franklin were asked or testified whether Mr. Engler had sufficient symptoms of cancer during the 90 day period that they would have been led to diagnose him as suffering from the disease. They only testified that they knew enough to be suspicious but stopped short of stating that they had been led to make a diagnosis of cancer at anytime prior to surgery. On the other hand, appellant's consulting physician, Dr. Koenig, testified that the existence of an x-ray showing a lesion was enough for him to make a diagnosis of "cancer until proven otherwise." Therefore, in light of the evidence there was a genuine issue of material fact as to whether Mr. Engler's cancer first manifested itself within 90 days of his policy's issuance. Accordingly, we hold that the court erred in granting a summary judgment.

The judgment is reversed and remanded for further proceedings consistent with this opinion.

All concur.